F. PATRICK QUINN, III

VERSUS

EDWIN M. PALMER AND
DECATUR HOTELS, L.L.C.


CONSOLIDATED WITH:

F. PATRICK QUINN, III

VERSUS

EDWIN M. PALMER, ET AL.

NO. 2023-CA-0181

COURT OF APPEAL

FOURTH CIRCUIT

STATE OF LOUISIANA
 CONSOLIDATED WITH:

NO. 2023-C-0254


APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2013-07753, DIVISION "E"
Honorable Omar Mason, Judge
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Rosemary Ledet, Judge
Tiffany Gautier Chase)


Robert J. Ellis, Jr.
R.J. ELLIS LAW FIRM, LLC
650 Poydras Street, Suite 2615
New Orleans, LA 70130

    COUNSEL FOR PLAINTIFF/APPELLEE


Stephen K. Conroy
Amanda Hogue
Chehardy Sherman Williams Recile Hayes
One Galleria Blvd., Suite 1100
Metairie, LA 70001

    COUNSEL FOR DEFENDANT/APPELLANT

      **OCTOBER 3, 2022 JUDGMENT AFFIRMED;
      WRIT DENIED
      February 5, 2024**

*RML*
*RLB*
*TGC*

This is a derivative proceeding. The parties to this ten-years old proceeding are plaintiff—F. Patrick Quinn, III, acting in a derivative capacity on behalf of Decatur Hotels, LLC ("Decatur")—and defendant—Edwin M. Palmer. Mr. Quinn and Mr. Palmer are former business associates. Following a one-day bench trial, the trial court rendered judgment in Decatur's favor against Mr. Palmer. From the trial court's judgment, Mr. Palmer appeals.[1] As discussed elsewhere in this opinion, Mr. Palmer simultaneously filed a writ application, which was consolidated with this appeal. For the reasons that follow, we affirm the trial court's judgment, dated October 3, 2022, and deny Mr. Palmer's writ.

**FACTUAL AND PROCEDURAL BACKGROUND**

In a prior appeal in this matter, this court summarized the background of this case as follows:

> Mr. Palmer and Mr. Quinn, along with Mr. Palmer's wife and others, formed Decatur in January 1989. Decatur is a business which owns and operates hotels in New Orleans, including the La Gallerie Hotel. Decatur also leases from a third party a property adjacent to the La Gallerie Hotel. From Decatur's inception, both Mr. Palmer and Mr.

---

[1] Although Mr. Palmer's wife—Dianne Palmer ("Mrs. Palmer")—is listed as an appellant, she is not a party to the judgment. For this reason, she is not a party to the appeal.

1

Quinn, along with their other business partners, acted as managers of Decatur. On September 24, 2007, Mr. Quinn ceased acting as a manager, but retained his ownership interest in the company. Thereafter, Mr. Palmer acted, and continues to act, as the sole manager of Decatur.

On August 16, 2013, Mr. Quinn filed a Petition for Specific Performance and Damages, naming Mr. Palmer and Decatur as defendants. In the petition, Mr. Quinn alleged that Mr. Palmer had been the sole member/manager of Decatur with sole control over the business since September 24, 2007. Mr. Quinn further alleged that, during Mr. Palmer's tenure as manager of Decatur, Mr. Palmer "converted vast sums of money from the accounts of Decatur for his personal use and account" and that these transactions were without the consent and agreement of the majority of Decatur's other members as required by Decatur's operating agreement. Mr. Quinn alleged that the amount of funds converted was over $5 million. Mr. Quinn also alleged that Mr. Palmer violated the operating agreement by refusing to make Decatur's financial records available for Mr. Quinn's inspection after Mr. Quinn made written demand. Finally, Mr. Quinn alleged that Mr. Palmer breached the terms of the lease agreement with the third party from whom Decatur leased the property adjacent to the La Gallerie Hotel and was shortly to be evicted, which would cause Decatur to be unable to continue to operate as a business.

*Quinn v. Palmer*, 19-1009, pp. 1-2 (La. App. 4 Cir. 3/25/20), 294 So.3d 541, 542-43 ("*Quinn 1*").

In his petition, Mr. Quinn additionally averred as follows regarding the Royal Hotel Group, LLC ("Royal") mortgage note (the "Mortgage Note"):

$800,000.00 of the funds improperly withdrawn by Edwin M. Palmer were used by Edwin M. Palmer to acquire, as a holder in due course, a promissory note and mortgage executed by Decatur which encumbered Decatur's sole income generating immoveable property. Edwin M. Palmer acquired the note and mortgage in the name of and by employing a corporate/limited liability company entity which was under his direction and control[, Royal]. Upon information and belief, Petitioners aver that it was and is Edwin M. Palmer['s] intent to force foreclosure of the property of Decatur through nonpayment of the note and, thus, take ownership of the only income producing property of Decatur for his personal account or for the account of an entity under his direction and control. Edwin M. Palmer has also advised F. Patrick Quinn that he intends to execute, in his capacity as manager of Decatur, a "*dation en* payment" thereby transferring the ownership of Decatur's encumbered property to himself or to the entity under his direction and control

2

Following years of delay (including the removal to, and remand from, federal court), the trial court held a hearing on Mr. Quinn's third motion to compel, fourth motion for contempt of court, and request for sanctions. The trial court found that Mr. Palmer and Decatur were in contempt for failure to follow its previous rulings to produce discovery responses. Because of the contempt, the trial court ordered that Mr. Palmer's and Decatur's defense and offset claims and reconventional demand claims be stricken (the "Sanctions Judgment"). Affirming the Sanctions Judgment, this court observed that the trial court did not abuse its discretion in imposing the draconian discipline given, among other things, that "both counsel for defendants as well as defendants themselves had obstructed or outright violated the court's pretrial orders on discovery and defendants had consistently continued to violate the orders." *Quinn 1*, 19-1009, p. 16, 294 So.3d at 551.

In February 2022, a one-day, bench trial was held. Before trial, all Mr. Quinn's claims asserted in his individual capacity were dismissed. One month earlier, in January 2022, the trial court granted summary judgment dismissing Mrs. Palmer's reconventional demand. Before trial, Mr. Quinn dismissed his claims against Mrs. Palmer. Thus, pre-trial all claims by and against Mrs. Palmer were dismissed. The sole matter tried in February 2022 was Mr. Quinn's derivative claim, on Decatur's behalf, against Mr. Palmer.

Enforcing the Sanctions Judgment, the trial court allowed only Mr. Quinn to call witnesses and to present evidence. Although Mr. Palmer was not permitted to

3

call witnesses or to present evidence, he was allowed, through counsel, to cross exam Mr. Quinn's witnesses and to challenge Mr. Quinn's evidence. Given Mrs. Palmer was not a party, she was not allowed to participate in the trial.

At trial, Mr. Quinn presented two expert witnesses—Patrick Egan and Carrol Gatlin—and one fact witness—himself. Mr. Egan was tendered and accepted as an expert in the areas of real estate appraisals, reporting, and review; Ms. Gatlin, as an expert in the areas of forensic review accounting and business valuation. As a fact witness, Mr. Quinn testified about the history of Decatur and its management.

A judgment was rendered in Mr. Quinn's favor as a derivative plaintiff—on Decatur's behalf—against Mr. Palmer. In its written reasons for judgment, the trial court summarized its findings as follows:

(i)     Mr. Quinn had standing both to bring and to maintain a derivative proceeding before this Court with respect to Decatur;

(ii)    The Exception of No Right of Action filed by Mr. and Mrs. Palmer was untimely and thus overruled;

(iii)   Mr. Palmer engaged in self-dealing and mismanagement of Decatur by, among other things, transferring valuable Decatur assets to other entities in which Mr. Palmer had a substantial or sole interest, and

(iv)    The total sum due and owing to Decatur by Palmer is $3,873,217.00.

This appeal followed.

## DISCUSSION

**Standard of Review and Outline of Opinion**

Established jurisprudence provides that "in all civil matters, the appropriate standard for appellate review of determinations is the manifest error-clearly wrong

standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety." *River Rental Tools, Inc. v. Smith Power Sols., LLC*, 21-0716, p. 3 (La. App. 4 Cir. 6/15/22), 342 So.3d 1052, 1056, *writ denied*, 22-01076 (La. 10/18/22), 348 So.3d 728 (citations omitted). Under this standard, an appellate court does not simply decide whether it would have reached a different result based on the facts; rather, to reverse, "the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong." *Id.*

Although Mr. Palmer assigns a half-dozen errors,[2] we divide our analysis into three parts: (i) valid final judgment; (ii) pre-trial rulings; and (iv) sufficiency of evidence.

**Valid Final Judgment**

---

[2] Mr. Palmer's assigned the following errrors:

[1] The courts below gravely-erred by not dismissing all Quinn claims on multiple Res Judicata, claims-preclusion and abandonment bases;

[2] The courts below gravely-erred by not enforcing the new Louisiana Business Act as to derivative actions;

[3] The Successor Court below gravely-erred in not revoking Decatur's Charter;

[4] The Successor Court below gravely-erred by stripping Diana Palmer of her right to have her ". . . day in court . . .";

[5] The Successor Court below gravely-erred in not allowing the Palmers to present evidence at the so-called February, 2022 trial; and

[6] Both Successor Court[s]-below gravely-erred in signing a judgment so replete with violations of decretal language and ruling impacting non-parties that a remand would be a vain and useless act.

5

An appellate court cannot determine the merits of an appeal unless its subject matter jurisdiction is properly invoked by a valid final judgment. *Freeman v. Phillips 66 Co.*, 16-0247, p. 2 (La. App. 4 Cir. 12/21/16), 208 So.3d 437, 440 (citation omitted); *see* La. C.C.P. art. 2083(A). Before reaching the merits of an appeal, an appellate court has a duty to determine—on its own motion, even if not raised by the parties—whether subject matter jurisdiction exists. *See Moulton v. Stewart Enterprises, Inc.*, 17-0243, p. 3 (La. App. 4 Cir. 8/3/17), 226 So.3d 569, 571 (citation omitted). Stated otherwise, an appellate court has a duty to determine if the judgment appealed from is a valid final judgment.

Based on his contention that the trial court's October 3, 2022 judgment is not a valid final judgment, Mr. Palmer simultaneously filed both an appeal and a writ. As noted at the outset of this opinion, this court consolidated his writ with his appeal. Mr. Palmer makes three arguments in support of his position that the October 3, 2022 judgment is not a valid final judgment and that this matter should be considered solely as a writ application: (i) the judgment lacks decretal language; (ii) the judgment fails to comply with the requirements for judgments affecting immovable property; and (iii) the judgment references non-parties. We separately address each of these issues.[3]

---

[3] Mr. Palmer makes a fourth argument, but it is not directly related to the validity of the judgment. He contends that Mr. Quinn's appellee brief violates La. Unif. R. Ct. App., Rule 2-12.3(7), which requires that "[b]riefs shall state on the cover or on the title page . . . a statement identifying the party on whose behalf the brief is filed and the party's status before the court." Mr. Palmer points out that nowhere in the appellee's brief is there a designation of who appellee's counsel represents—"Decatur Hotels? Quinn individually? Quinn derivatively?" But, a review of Mr. Quinn's appellee brief reflects that in the caption of the case set forth on the cover of the brief the appellee is identified as plaintiff, Mr. Quinn. This argument is unpersuasive.

*Lack of Decretal Language*

Mr. Palmer contends that the trial court's judgment lacks proper decretal language and, for that reason, it is not a valid final judgment. Decretal language is defined as "the portion of a court's judgment or order that officially states (decrees) what the court is ordering and generally starts with the formula [i]t is hereby ordered, adjudged, and decreed that . . . ." *Jones v. Stewart*, 16-0329, p. 5 (La. App. 4 Cir. 10/5/16), 203 So.3d 384, 387 (internal quotations and citation omitted).

To comply with the decretal language requirement, a judgment must contain the following elements:

- It "must name the party in favor of whom the ruling is ordered";

- It must name "the party against whom the ruling is ordered"; and

- It must state "the relief that is granted or denied."

*Moulton*, 17-0243, pp. 4-5, 226 So.3d at 572 (reformatted and citations omitted). The trial court's October 3, 2022 judgment satisfies all these elements. It specifies the party in whose favor it is made—Decatur—and against whom it is made—Mr. Palmer; and it spells out the relief granted in the judgment itself. The judgment, thus, complies with the decretal language requirement. This argument is unpersuasive.

*Judgment Fails to Comply with Requirement for Judgment Affecting Immovable Property*

Mr. Palmer further contends that the October 3, 2023 judgment is invalid because it fails to comply with La. C.C.P. art. 1919, which provides, in pertinent

part, that "[a]ll final judgments which affect title to immovable property shall describe the immovable property affected with particularity." *Id.*

Louisiana jurisprudence has divided the requirements for a valid final judgment into two categories: (i) absolute requirements—decretal language requirements; and (ii) precatory requirements—rules that set forth what a judgment should contain, but if not followed would not render the judgment invalid. *See* Gail S. Stephenson, *Drafting Lucid, Unmistakable (and Valid) Judgments*, 56 La. B.J. 181, 182 (2008). The rule codified in La. C.C.P. art. 1919 for judgments affecting title to immovable property is a precatory requirement. *See Fields v. Etheridge*, 487 So.2d 551, 552 (La. App 4th Cir.1986) (observing that when "the particularized description has been lacking, appellate courts have amended judgments to include such description"). Even assuming this requirement applies, the failure to comply with it does not render the judgment invalid. This argument is unpersuasive.

*Judgment Impacts Non-parties*

Mr. Palmer still further contends that the judgment is invalid because it impacts non-parties. He, however, cites no authority for the principle that a judgment impacting a non-party is invalid. Nor could we find any authority for this

principle.[4] Regardless, the only party the October 3, 2022 judgment casts in

judgment is Mr. Palmer.[5] This argument is unpersuasive.

---

[4] Although not directly on point, the federal Fifth Circuit in *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 526, n.16 (5th Cir. 2016), observed that a small group of exceptions have been recognized to the general rule that a non-party cannot be bound to the outcome of a prior lawsuit by claim preclusion and enumerated those exceptions as follows:

> First, a person who agrees to be bound. . . . Second. . . . a variety of preexisting substantive legal relationships between the person to be bound and a party to the judgment. Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor. . . . Third . . . in certain limited circumstances a nonparty may be bound by a judgment because she was adequately represented by someone with the same interest who was a party to the suit. . . . Fourth, a nonparty may be bound by a judgment if she assumed control over the litigation in which that judgment was rendered. . . . Fifth, a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy. . . . Sixth, in certain circumstances a special statutory scheme may expressly foreclose successive litigation by nonlitigants.

*Id.* (internal citation and quotation omitted).

[5] In the October 3, 2022 judgment, the trial court references Royal, Mr. Palmer's wholly-owned company. Mr. Palmer contends that Royal was not a party in this case, yet the judgment purports to extinguish a secured debt without notice to Royal, the mortgage-holder. The pertinent language of the judgment provides as follows:

> [A]s a result of Defendant, Edwin M. Palmer's breach of fiduciary duties owed to Decatur Hotels, L.L.C., including his self-serving dealings, the mortgage balance owed by Decatur Hotels, L.L.C. to Edwin M. Palmer and/or his solely-owned company, Royal Hotel Group, L.L.C., is reduced to ZERO . . . , and the Clerk of the Civil District Court for the Parish of Orleans—Land Records Division is hereby ordered to cancel the mortgage inscription for the said mortage accordingly."

As discussed elsewhere in this opinion, the reduction of the Mortgage Note to zero was done as a part of the calculation of Mr. Palmer's Account Receivable balance owed to Decatur. This calculation—an offset—is supported by Ms. Gatlin's expert testimony. Nothing about this aspect of the judgment renders it invalid.

Likewise, the trial court, in its judgment references Duba and in its reasons for judgment, references both Duba, LLC, and Elise LLC—another entity solely owned by Mr. Palmer. This reference is made in connection with calculation of damages owed by Mr. Palmer for the Duba Lease transfer loss and does not render the judgment invalid.

In sum, the trial court's October 3, 2022 judgment satisfies the jurisprudential requirements for a valid final judgment. None of Mr. Palmer's arguments regarding the validity of the judgment is persuasive.

**Pre-trial Rulings**

On appeal, Mr. Palmer raises as error five of the trial court's pre-trial rulings: (i) denial of his *res judicata* exception; (ii) denial of his and Mrs. Palmer's no right of action exception; (iii) preclusion of Mrs. Palmer from participating at trial; (iv) denial of his challenge to the validity of this derivative proceeding under the Louisiana Business Corporation Act ("LBCA"); and (v) denial of his request to revoke Decatur's charter—correctly, articles of incorporation. We separately address each ruling.

*Res Judicata Exception*

Mr. Palmer's attempt to assert a *res judicata* exception, as Mr. Quinn points out, is barred by the Sanctions Judgment, striking all of Mr. Palmer's defenses. Simply stated, the *res judicata* exception is a defense that was stricken. This argument is unpersuasive.

*No Right of Action Exception*

At the end of the bench trial, the trial court ordered the parties to submit post-trial memoranda by March 21, 2022, and ordered that the matter would be submitted for consideration on that date. Three days after the matter was submitted, Mr. and Mrs. Palmer filed an exception of no right of action. The trial

10

court overruled the exception as untimely. [6]  Explaining its rationale for overruling

the exception, the trial court, in its written reasons for judgment, observed that Mr.

Palmer's argument was that by referencing the filing of the exception in his post-

trial memorandum, he met the requirement of filing the exception before

submission. Disagreeing, the trial court quoted the reference Mr. Palmer made to

such an exception in his post-trial memorandum, which was as follows:

> We have obeyed the Court's admonition against raising the Res Judicata and Summary Judgment Arguments again. Those will be sent to the 4th Circuit Court of Appeals on writs after the Court signs the Interlocutory Orders. But **we have never raised the Peremptory Exception of No Right of Action, and will do so by a separate pleading with a rule to show cause order.** An expeditious grant of dismissal *now* will save [Mrs. Palmer's] lawyer the time and effort to file writs and will save this Court's time and valuable resources immensely. This case has no merit. This is an exercise of the most vile cardinal sins: *avarice*, *gluttony* and *greed*. (Emphasis in original).

The trial court observed that Mr. Palmer, in his post-trial memorandum, referenced

"the future raising of an exception of no right of action, but he did not actually file

the exception until several days later."

Pursuant to La. C.C.P. art. 928(B), the peremptory exception may be pleaded

at any state of the proceeding in the trial court before "submission of the case for a

decision." La. C.C.P. art. 928(B). The trial court concluded that the matter was

"submitted" for decision before the formal pleading of the exception of no right of

action was made, rendering the exception untimely pursuant to La. C.C.P. art.

928(B). Stated otherwise, the time for submission was March 21, 2022; the

---

[6] As noted elsewhere in this opinion, Mrs. Palmer is not a party to this appeal.

11

exception was filed three days later. The trial court thus denied the exception as untimely. We agree.

*Preclusion of Mrs. Palmer from Participating at Trial*

Mr. Palmer argues that the trial court erred in precluding Mrs. Palmer from participating—presenting evidence or calling witnesses—at trial. Mr. Palmer contends that the trial court's refusal to allow Mrs. Palmer to defend herself and the community violated her constitutional rights. Rejecting this argument, the trial court, in its written reasons for judgment, observed that all claims by and against Mrs. Palmer were dismissed before trial. Hence, Mrs. Palmer was not a party when the trial commenced. We agree. The only matter tried was Mr. Quinn's derivative claim, on Decatur's behalf, against Mr. Palmer.

*Validity of derivative proceeding*

Mr. Palmer next argues that that Mr. Quinn lacks standing to bring the derivative proceeding and the trial court erred in failing to enforce the LBCA's requirements for derivative proceedings. Mr. Quinn counters that the LBCA argument was a last-minute defense prohibited by the Sanctions Judgment. Alternatively, Mr. Quinn contends that the LBCA is inapplicable to the present derivative proceeding, which was filed two years before the LBCA became effective. This derivative proceeding was commended in 2013; the LBCA's effective date was in 2015.

In addressing this issue, the trial court, in its reasons for judgment, acknowledged that Mr. Palmer's challenge to Mr. Quinn's standing to bring a

derivative proceeding was untimely. Nonetheless, the trial court addressed the issue. In so doing, the trial court first observed that La. C.C.P. art. 615 allows a "member of . . . [an] unincorporated association to enforce a right of the . . . unincorporated association." The trial court further observed that La. R.S.12:1365 provides that "[a] limited liability company shall be treated as an unincorporated association under Chapter 5 of Title II of Book I of the Louisiana Code of Civil Procedure [that provided for derivative actions]."[7] As a member of Decatur, the trial court found that Mr. Quinn had standing to bring a derivative proceeding to enforce Decatur's rights.

Turning to Mr. Palmer's argument regarding the requirement imposed by the LBCA, the trial court observed that three provisions of the LBCA were relevant

---

[7] In conjunction with the enactment of the LBCA, the Legislature added to La. C.C.P. art. 611 the following provision: "[i]f a derivative action is a 'derivative proceeding' as defined in the Business Corporation Act, the action is exempt from the provisions of this Chapter other than this Subsection, and is subject instead to the provisions of the Business Corporation Act concerning derivative proceedings." La. C.C.P. art. 611(B).

La. R.S. 12:1-741,[8] La. R.S. 12:1-742,[9] and La. R.S. 12:1-742.1.[10] The trial court

observed that Mr. Quinn satisfied the requirements of La. R.S. 12:1-741(A) and

<hr>

[8] La. R.S. 12:1-741, which provides:

> A. A shareholder may not commence or maintain a derivative proceeding unless the shareholder satisfies all of the following conditions:
>
>> (1) Was a shareholder of the corporation at the time of the act or omission complained of or became a shareholder through transfer by operation of law from one who was a shareholder at that time.
>>
>> (2) Fairly and adequately represents the interests of the corporation in enforcing the right of the corporation.
>
> B. A shareholder who meets the requirements of Subsection A of this Section may file a derivative proceeding to enforce a right of the corporation, but only after the shareholder satisfies the requirements of R.S. 12:1-742.

[9] La. R.S. 12:1-742, which provides:

> No shareholder may commence a derivative proceeding until the following conditions are satisfied:
>
>> (1) A written demand has been made upon the corporation to take suitable action.
>>
>> (2) Ninety days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety-day period.

[10] La. R.S. 12:1-742.1, which provides:

> The petition in a derivative proceeding shall do all of the following:
>
> (1) Allege that the plaintiff meets the standing requirements of R.S. 12:1-741.
>
> (2) Allege either that the plaintiff made demand upon the corporation at least ninety days before the filing of the petition as required by R.S. 12:1-742 or that the plaintiff made the demand and, for reasons alleged in the petition, the filing of the petition before the expiration of the ninety-day period complies with R.S. 12:1-742.
>
> (3) Join as defendants the corporation and the obligor on the obligation sought to be enforced.
>
> (4) Include a prayer for judgment in favor of the corporation and against the obligor on the obligation sought to be enforced.
>
> (5) Be verified by the affidavit of the plaintiff or his counsel.

that he did not have to satisfy the requirements of La. R.S. 23:1-742 to maintain this derivative proceeding. In so finding, the trial court emphasized the different language in La. R.S. 1-741(A)—"to commence or to maintain" a derivative proceeding—and La. R.S. 1-742—"to commence" a new derivative proceeding. The trial court observed that "[u]nlike subsection A, subsection B [of La. R.S. 1-741] includes no language that makes it requirements apply retroactively to already-filed derivate suits." In further support, the trial court cited La. R.S. 12: 1-742, which likewise includes the language "may commence" and does not include the language "to maintain" a derivative proceeding. The trial court observed that the requirements of La. R.S. 12:1-742 do not apply to an action that was already filed before the January 1, 2015 effective date of the LBCA. For these reasons, the trial court found that Mr. Quinn had standing to maintain this derivative proceeding at the time it was filed in 2013 and that he maintained such standing after the LBCA's enactment in 2015.

We find, agreeing with the trial court, that the provisions of the LBCA that Mr. Palmer seeks to invoke cannot be construed to apply to a derivative proceeding, such as this one, that was filed before the LBCA was enacted. Hence, Mr. Palmer's arguments that Mr. Quinn lacks standing and that this proceeding should be dismissed for failure to comply with the LBCA are unpersuasive.

*Decatur's Charter—Articles of Incorporation—Revocation*

Mr. Palmer raises the issue of revocation of Decatur's charter—correctly termed, articles of organization[11]—for the first time on appeal. Issues raised for the first time on appeal are not properly before an appellate court. *See Hardy v. Juvenile Justice Intervention Ctr.*, 21-0715, p. 5 (La. App. 4 Cir. 6/15/22), 342 So.3d 1076, 1080 (observing that "[i]t is well settled that appellate courts will not consider issues raised for the first time, which are not pleaded in the court below and which the district court has not addressed")(internal citations and quotations omitted). For this reason, we decline to consider this issue.

**Sufficiency of the Evidence**

Absent from Mr. Palmer's assigned errors is an argument regarding the sufficiency of the evidence that Mr. Quinn presented at trial. Instead, Mr. Palmer contends that the relevant facts are those set forth in his four proffers that the trial court rejected and that the facts presented by Mr. Quinn are irrelevant.[12] This argument is belied by the Sanctions Judgment, which this court affirmed in *Quinn 1*. Again, as a result of the Sanctions Judgment, only Mr. Quinn could present witnesses and evidence at trial. Although the trial court ruled in Mr.

---

[11] Although the revocation issue was not raised in the trial court, the Palmers filed an action in federal district court seeking to have the State Attorney General and the Louisiana Secretary of State revoke Decatur' articles of organization. The federal court dismissed the matter. *Palmer v. Decatur Hotels, LLC*, CV 22-00442-BAJ-RLB, 2023 WL 2064052, at *2 (M.D. La. Feb. 16, 2023. In its ruling, the federal district court correctly observed that "[s]eeing as Decatur Hotels, LLC is a limited liability company, the Court assumes that by 'corporate charter' Plaintiffs mean 'articles of organization.'" *Palmer*, 2023 WL 2064052, *1, n.1. We, likewise, make that assumption.

[12] This court granted Mr. Palmer's motion to supplement the record with copies of his four proffers—(1) *In Globo* Exhibit Palmer 1; (2) Exhibit Palmer 2; (3) Exhibit Palmer Exhibit Palmer 3; and (4) Exhibit Palmer 4. Given the Sanctions Judgment, this proffered evidence is not properly considered in deciding the merits of this appeal.

Quinn's favor, the record reflects that the trial court granted only part of the relief that Mr. Quinn requested.[13] The relief that was granted is supported by the record.

The initial issue the trial court addressed was whether Mr. Quinn violated his fiduciary duty to Decatur. Answering that question in the affirmative, the trial court observed, in its written reasons for judgment, that "[a] member/manager of an L.L.C, can be held personally liable to the limited liability company if he engages in conduct which demonstrates an 'intentional breach of his duty of loyalty' to the L.L.C." *See* La. R.S. 12:1314 (A)(1).[14] The trial court further observed that "[i]n order for a member/manager to make a business judgment in good faith for purposes of fulfilling his duty of diligence, care, judgment, and skill, he cannot have a 'conflict of interest with respect to the subject of the business judgment.'" *See* La. R.S. 12:1314 (D)(1).[15] Based on the evidence, the trial court

---

[13] The trial court rejected the argument that damages were due for the loss on the "Thriffiley Lease" and confined the damage award for the St. James Hotel to a one-time loss as opposed to a bigger loss claim based on lost profits, of $11,698,148.

[14] La. R.S. 12:1314(A)(1) provides:

> A. Subject to the provisions of R.S. 12:1315, a member, if management is reserved to the members, or manager, if management is vested in one or more managers pursuant to R.S. 12:1312:
>
> > (1) Shall be deemed to stand in a fiduciary relationship to the limited liability company and its members and shall discharge his duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances. . . .

[15] La. R.S. 12:1314 (D)(1) provides:

> D. A member or manager who makes a business judgment in good faith fulfills the duty of diligence, care, judgment, and skill under Subsection A of this Section if the member or manager:
>
> > (1) Does not have a conflict of interest with respect to the subject of the business judgment.

found that Mr. Palmer breached certain fiduciary duties he owed as a manager and member of Decatur and that his breach was the cause of damage Decatur suffered.

The trial court divided the damages it found that Mr. Palmer's breach caused into the following four categories:

(i)     Mr. Palmer's Account Receivable Balance—$892,411.00;

(ii)    Royal Mortgage Note—$00.00;

(iii)   Duba Lease Transfer Loss—$1,330,806.00; and

(iv)    Sale of St. James Hotel One-time Loss—$1,650,000.00.

Again, the total sum awarded to Decatur was $3,873,217.00. We separately address each of these four categories.

*Mr. Palmer's Account Receivable Balance*

An account receivable—according to Ms. Gatlin, Mr. Quinn's expert—is "money that is owed to the corporation or partnership from anyone," generally from a partner, and that generally is accompanied by a signed promissory note to make a record of the amount owed.[16] Ms. Gatlin testified that, as to Decatur's records, such was not the case. Rather, the amounts owed by the member—here, Mr. Palmer—were simply maintained in the general ledger.

Addressing this category, the trial court observed that Mr. Quinn sought $892,411.00 for the Account Receivable owed by Mr. Palmer and that this figure was supported by Ms. Gatlin's expert testimony and her calculations. The trial

---

[16] *See also Account,* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining an "account receivable" as "a]n account reflecting a balance owed by a debtor; a debt owed by a customer to an enterprise for goods or services. — Often shortened to receivable; receivables. — Also termed note receivable; bill receivable").

court observed that "[i]n determining this sum, because of the limited documentation available due to Mr. Palmer's blatant refusal to comply with discovery, for which he has been sanctioned, Ms. Gatlin had to extrapolate and estimate to determine the amount (in accounts receivable) owed to Decatur Hotels, L.L.C, by Palmer, in reimbursement." The trial court additionally observed that Ms. Gatlin's opinion was that "there was a pattern of [Mr.] Palmer making withdrawals from Decatur's accounts to pay personal expenditures," that "[o]n average, there were approximately four or five withdrawals made per month," and that "[s]he primarily extrapolated this based on her review of the general ledger of Decatur maintained during [Mr.] Palmer's management."

The record supports the trial court's findings. Ms. Gatlin testified as follows:

> A partner receivable generally I expect to have a signed promissory note and have records that way, but it appears in this case that the [sic] repeated in the pattern of withdrawals that were made monthly. There would be four or five withdrawals every month at least. Those were withdrawals to pay what looked like personal expenditures on the part of Mr. Palmer, and so I had outlined those withdrawals and I picked them up. I started based on the general ledger. I started in September 2010 and I scheduled out to what I had which was March 31, 2012 and summed those together.[17]

As the trial court observed, Ms. Gatlin testified that she had to extrapolate and estimate to determine the amount owed to Decatur, because "absent of having complete records as part of forensic accounting we fill in the blanks the best we can, and we realize that it's not always the perfect equation, but you do the best you

---

[17] At the trial of this matter, it was pointed out that a peremptive period applied and that, as a result, the period before August 11, 2010 was not at issue at trial. In her expert reports, Ms. Gatlin stated that "[t]he Period subject to review was August 11, 2010 through March 31, 2016 (the Period)."

can, you use your best professional judgment to get what seems like a reasonable answer to using a reasonable approach." When questioned about what records were missing Ms. Gatlin testified that she had no bank statements, no cancelled checks, no tax returns, and no records beyond March 31, 2012.

Utilizing the records that were produced, Ms. Gatlin built her analysis around trends and patterns, and testified that "[a] historical past is the best predictor of the future." Ms. Gatlin explained her methodology was in essence a mathematical equation. Regarding that equation, she testified as follows:

> So I took that roughly $468,000, divided it by the 20 months and I came up with $23,418. And so my period that I was extrapolating out to was to March 2016, which was another 48 months. So if I take the 23,418 by another 48 months we come up with 1.124055 million. Add that on 468,356 and we have $1,592,411, which is obviously different than the Palmer account receivable there. What I did is I took out $700,000 of that account receivable and applied it to the mortgage balance.[18]

As explained elsewhere in this opinion, Ms. Gatlin offset the Account Receivable sum due by the $700,000, which she applied to the balance of the Mortgage Note. Based on this analysis, Ms. Gatlin determined that Mr. Palmer's account receivable due to Decatur was $892,411.00, which is the sum the trial court awarded. Based on our review of the record, we cannot conclude this award was manifestly erroneous.

*Mortgage Note*

---

[18] Ms. Gatlin testified that the figures she gave were "roughly" such amounts. For this reason, the amounts are not exact.

The trial court found that the Mortgage Note balance owed by Decatur was zero. In its written reasons for judgment, the trial court explained this aspect of its judgment as follows:

> Royal Hotel Group, L.L.C., a business wholly owned and operated by Edwin Palmer, acting through Palmer, purchased the mortgage note from FH Partners for $700,000.00. The evidence revealed that $700,000.00 purchase price payment came from Decatur Hotels, L.L.C.'s account. This effectively reduced the mortgage balance owed by Decatur Hotels, L.L.C. to FH Partners from $1,500,000.00 to $800,000.00. The new Royal Hotel Group, L.L.C. mortgage purportedly owed by Decatur Hotels, L.L.C. was $1,500,000.00. However, evidence presented in the form of emails and other records reviewed by its expert, Carrol Gatlin, indicated that Edwin Palmer took an additional $800,000.00 from Decatur to pay down the purported $1,500,000.00 Royal mortgage balance. This occurred after Royal Hotel Group, L.L.C. acquired the mortgage from FH Partners.
>
> Based on the evidence presented, the Court finds that it was evidence that Edward Palmer took the $700,000.00 from Decatur Hotels to pay for the purchase of the mortgage note through his solely-owned business, Royal Hotel Group, L.L.C., from FH Partners. Thus, that $700,000.00 mortgage purchase and the subsequent $800,000.00 pay-down becomes a balance owed to Decatur Hotels, L.L.C. from Palmer's account receivable. In light of this, the purported $1,500,000.00 Royal Hotel Group, L.L.C. mortgage note balance is reduced to $0.00, as the Court finds that all of the funds associated with its purchase and pay-down were from Decatur Hotels, L.L.C.

At trial, Ms. Gatlin explained that the reduction of the Mortgage Note was part of the Account Receivable calculation. Ms. Gatlin testified as follows:

> Q. And why did you take the 700,000 and deduct that from the Palmer accounts receivable?
>
> A. Because on a basic level if he has taken $1.6 million from the company and the company doesn't have the $ 1.6 million to pay for the mortgage that he acquired it was Decatur's money that paid for that mortgage. So I took the $700,000 and moved it from the Palmer account receivable and applied it to the mortgage.

Ms. Gatlin further testified that the funds to purchase the mortgage were taken directly from Decatur.

> Q. Now the note that as in your report, the Palmer owned Royal Hotel LLC had a $1.5 million mortgage on the Chateau Dupre Hotel.[19] You've got another - you got a $700,000 due from Palmer, and you have an $800,000 withdrawal of purchase funds. Where did the $800,000 come from?

> A. The $800,000 came from - its an exhibit here - exhibit cc . . . ; There was an email dated August 5 from Scott Day[, a manager of Decatur] saying we've pulled $800,000 out to pay down this mortgage, and on page 3 of cc there's the detail of where this money was pulled out and paid down that mortgage.

Ms. Gatlin additionally testified that the ledger "reflects a systematic withdrawal of funds over the four-month period in 2011 that totaled the $800,000 withdrawal." Despite the pay down on the loan, on August 24, 2011, Decatur received correspondence that FH Partners sold the balance of Decatur's mortgage to Royal and that the new mortgage with Royal was for $1.5 million with no credit for Decatur's recent pay downs.

Ms. Gatlin explained her offset calculation regarding the Mortgage Note as follows:

> Q. . . . There's a mortgage that's being held by Royal Hotel Group $1.5 million against Chateau Dupre, correct?

> A. Correct.

> Q. Of that $1. 5 million $800,000 came from Decatur funds?

> A. Correct.

> Q. And another $700,000 you deducted from Mr. Palmer's accounts receivable, correct?

---

[19] Decatur's hotel that previously was known as the Chateau Dupre Hotel is now known as the La Gallerie Hotel.

22

A. Yes.

Q. And that's how you end up with the balance of zero?

A. Correct.

Based on the above, we cannot say the trial court was manifestly erroneous in finding that the Mortgage Note balance is zero based on Ms. Gatlin's setoff calculation.

*Duba Lease Transfer Loss*

The trial court found that Decatur was owned $1,330,806.00 by Mr. Palmer for the loss attributable to the Duba Lease transfer. Explaining this ruling, the trial court, in its written reasons for judgment, observed:

> Duba, LLC owned an adjoining structure that houses approximately 40% of the rooms which make up Decatur's hotel property. Decatur leased two staircase exits from Duba per fire marshal requirement. This lease was and is essential to Decatur's operations. The Court finds that Edwin Palmer's mismanagement and self-dealing caused the Duba Lease to go into default and eviction proceedings instituted. The evidence reflects that to avoid eviction for non-payment of rent by Decatur Hotels, L.L.C. while under Palmer's management, the lease had to be renegotiated. However, Edwin Palmer renegotiated the lease with an increase in rent (going from $7,652.00 to $12,194.00 per month). Edwin Palmer then transferred the renegotiated lease from Decatur's name (as Lessee) to Elise LLC (Another entity solely owned by Palmer), in order for Palmer to gain direct control over Decatur's leasehold interest. Plaintiff's expert, Carrol Gatlin, opined that the mismanagement and self-dealing of Palmer caused a loss to Decatur Hotels, L.L.C., in the amount of $1,330,806.00.

The trial court's finding that Mr. Palmer is indebted to Decatur for $1,330,806.00 due to the Duba Lease transfer loss is supported by the record. The rental on the Duba Lease increased from $7,652 to $12,194 monthly. Ms. Gatlin explained that this transaction had already resulted in an additional rent expense of $622,254.00 and that, if taken to the term of the lease in 2034, will cost an additional

23

$708,552.00 for a total loss of $1,330,806.00. We cannot conclude that the trial court's award of this amount for the Duba lease transfer loss is manifestly erroneous.

*Sale of St. James Hotel*

The final, and largest, award was $1,650,000.00 for the one-time loss as a result of the sale of the St. James Hotel. Explaining this category, the trial court, in its written reasons for judgment, observed:

> Mr. Palmer participated in a pattern of multiple self-dealing transactions and mismanagement of the asset, the St. James Hotel, located at 330 Magazine Street, New Orleans, Louisiana, to the detriment of Decatur Hotels, L.L.C. . . . Mr. Egan [who was qualified as an expert in real estate appraisals and review] conducted a review of a 2011 appraisal done by the Murphy appraising firm on the St. James Hotel, . . . a 2012 appraisal ordered by First NBC Bank, and a 2014 appraisal done by Murphy appraising of the St. James Hotel. Mr. Egan testified that the 2011 appraisal that was ordered by defendant, Edwin Palmer, valued the St. James Hotel at $5.6 million dollars. Egan testified that the engagement letter requesting the 2011 appraisal would prove detrimental to the validity of the appraisal, as it "instructed the appraiser to disregard deferred maintenance and to disregard any discount that would be appropriate for fractional interests." Egan further testified that this instruction should have been disregarded, as it would and did result in a misleading opinion of value and a misleading appraisal report.

> Egan contrasted the 2011 appraisal with the 2012 appraisal. The 2012 appraisal, done only 7 months after the 2011 appraisal, indicated that the property value had increased by approximately 41% to $7.8 million dollars. When analyzing these facts, Egan specifically stated that "in Egan's June 13, 2018 report also reflects his retrospective valuation of the St. James Hotel in September 2011 at $7.8 million. When analyzing these facts, Egan specifically stated that "in the context of these two appraisals, it's impossible, absolutely impossible." He further noted that the St. James Hotel was sold for $5.6 million dollars right after it had been appraised at $7.8 million. He concluded that this was not considered a market value or arm's length transaction.
> .
> The Court finds that, based on the evidence and expert testimony presented at trial, Mr. Palmer facilitated the July 2012 sale of the St. James Hotel for $5.6 million, after it had been appraised at $7.8 million,

24

to a newly-formed L.L.C., BM Hotels, LLC, of which he was member. This transfer occurred without a vote of the majority of the membership of Decatur, as required by the Operating Agreement of Decatur Hotels, L.L.C., nor were any funds paid to Decatur as a result of the transfer. On cross-examination conducted by counsel for Palmer, none of these conclusions were challenged. . . . [T]the Court finds that Edwin Palmer engaged in self dealing and mismanagement with respect to the sale of the St. James Hotel, to the detriment of Decatur Hotels, L.L.C.

The trial court rejected as speculative Mr. Quinn's argument that Mr. Palmer should be liable for lost profits as a result of the St. James Hotel sale. The trial court, thus, confined the damages for the sale of the St. James Hotel to a one-time loss award. We find the record supports the trial court's $1,650,000.00 award for the one-time loss. We cannot conclude this finding is manifestly erroneous.

## DECREE

For the foregoing reasons, we affirm the trial court's October 3, 2022 judgment and deny Mr. Palmer's writ application.

**OCTOBER 3, 2022 JUDGMENT AFFIRMED; WRIT DENIED**